PETROPLUS, JUDGE:
This is a claim filed in this Court on October 21, 1968, in the amount of $224,768.11, and later amended by Petition seeking an additional amount of $366,829.56, or a total sum of $591,- *194 597.67, in which the petitioner, C. J. Langenfelder & Son, Inc., a corporation, seeks damages from the State Road Commission, now the West Virginia Department of Highways, in connection with a construction contract between the parties to construct a roadway and two bridges in the City of Wheeling, Ohio County, West Virginia.
The contractor claimant, C. J. Langenfelder & Son, Inc., a Maryland corporation, brought this action against the State Road Commission of West Virginia, respondent, to recover damages for alleged delays caused by the Commission in the construction of a highway and bridges near the east portal of Wheeling Tunnel on a section of Interstate Route No. 70, within the corporate limits of the City of Wheeling. The claimant-petitioner is a Company engaged in heavy highway and industrial construction work and has been so engaged for the past fifty years in the construction of dams, airports, power houses, highways, bridges and tunnels. Some of its projects have included the Andrews Air Force Base, the Dulles International Airport, the New York State Thruway, the Connecticut Turnpike, the New Jersey Turnpike and the Pennsylvania Turnpike and tunnels. There can be no doubt that the claimant was well qualified to undertake a complicated and expensive multi-million dollar project in a congested and highly urbanized area of the City of Wheeling, involving many variables, such as traffic flow, Acts of God, floods, slides, relocation of streets and utilities, and unforeseen conditions which required many change orders, extras, supplemental agreements and forced account agreements during the progress of the work.
In order to bring the project to completion in accordance with the voluminous plans and specifications prepared and furnished by the Commission, the contractor was required to coordinate his work with other projects in the area, maintain a traffic flow, and subcontract portions of the work to other contractors. The contract was awarded pursuant to bids on December 29, 1964, to the petitioner, on specified unit prices rather than on a lump sum agreement and the project was designated therein as “East Portal of Tunnel to DeChantal Road, 1-70-1 (13) 2, Contract No. 2”, covering an area of approximately 1657 feet in length. The project was to be completed in 550 working days. The work was satisfactorily performed and was accepted by the State Road Commission as *195 being in accordance with the plans and specifications. However, the work was not completed until the month of August, 1966, 110 working days beyond the planned and scheduled completion date.
Because of the complexity of the project, and the activity in other separate projects in the same area, which encompassed a winding creek, a heavily traveled City Street, railroad rights of way, sewer lines, water lines, gas and telephone lines, the contractor prepared a sequence of coordinated operations, which it intended to follow and which sequence was made a part of the specifications.
The contractor claims that many unreasonable delays, not contemplated by the parties and attributable to the inefficiency and incompetence of State Road Commission personnel, disrupted a critical and planned sequence of operations for the work, resulting in damages of great magnitude to the contractor. Two other contracts had been awarded to the petitioner in adjoining areas of operation which involved the construction of two tunnels through a hillside and the portals and approaches thereto.
According to the allegations of the Petition, the Company started to work soon after the contract was executed, when a defect in the plans and specifications was discovered which caused an enforced suspension of the work to provide time for the consulting engineers of the State to make subsurface explorations and studies. This delayed the progress of the work from June 3, 1965, to September 20, 1965, a period of approximately 110 days. The suspension of operations was ordered by the Chief Engineer of the respondent when pile driving for the construction of a pier designated as EB-2 revealed a hazard which required the consideration of the consulting engineers for the project, who had been independently employed by the Commission. The apprehension of the consulting engineers was evidenced by a long delay in studying the problem and eventually redesigning the bridge structure. The suspension of operations naturally delayed the planned relocation of the utilities, which delay in turn prevented the construction of other bridge piers in the area, and the erection of the structural steel which was on order and planned for delivery on specific dates, as well as the paving of a relocated. *196 City Street. The bridge piers which were planned for construction in the summer and early fall of 1965 were not constructed and completed until the late winter of 1966. The maintenance of a detour was prolonged and piers constructed adjacent to the detour required sheeting protection. The relocation of McColloch Street was constructed under adverse winter weather rather than in the summer of 1965, as originally planned when the weather would be dry and the area would be workable. Muddy excavated material had to be replaced by suitable stockpiled materials. None of these factors were taken into consideration by the contractor in his bid proposal as they were not anticipated and within the contemplation of the parties.
The steel for the bridges which was planned for erection in September, 1965, under a schedule and sequence of shipments from the Fort Pitt Bridge Works was not erected until January, 1966, resulting in heavy costs for storing, rehandling and reconditioning the steel. Lighting facilities which were to be provided for the highway and bridges which required adjustments to the superstructure were not planned and specified by the Commission until one and one-half years after the work started on the project, thereby delaying the construction of the concrete superstructures on the bridges from November, 1965, until April, 1966.
When the contractor made his proposal, the bids were prepared on a plan to complete the project within 550 working days. The additional expenses incurred by the contractor in idle equipment and maintaining its plant, paying supervisory personnel and overhead items for the extra 110 days, not contemplated by the contract, is the basis for this action. The contractor claims a sustained loss in the aggregate of $591,-597.67, supported by numerous exhibits and cost calculations.
All of the above contentions were supported by evidence from reliable and trustworthy witnesses.
The Answer of the respondent sets forth that the expense in relocating the office trailer was the responsibility of the contractor, who should have known that the location thereof was detrimental to operations under other contracts awarded to . the petitioner. The evidence clearly indicated that the trailer *197 was located on a site approved by the engineers of the respondent, who apparently have the last word on where the field offices should be located for the convenience of all parties concerned. Since the trailer had to be removed as an obstruction to other projects, we conclude that the cost of its removal must be borne by the State. If its original location was improper, the State should not have given its approval to the site selection; the contractor being subject to the supervision of the State engineers is required to obey the orders of the engineers and failure to do so is cause for the contractor’s removal from the job site.
The Answer otherwise denies petitioner’s allegations, and affirmatively states that the petitioner should have sought compensation under the “extra work” provisions of the Standard Specifications. Paragraph 1.5.11, which is applicable to cases where the contractor seeks extra compensation for work or materials not clearly covered by the contract. The claim before us is essentially a claim for damages resulting from a breach of contract, causing losses to the contractor sounding in tort. It is not a claim for work under the contract not clearly covered in the terms of the contract, and we rule the particular specification as being inapplicable to the case before us for decision. For the same reasons, we rule that Standard Specification 1.9.4 relating to compensation for extra work ordered and accepted by the contractor is inapplicable to the factual situation of this case. In all other respects the Answer charges the petitioner with inefficiency, overcharges, duplication of items and failure to use reusable materials, all of which allegations being in effect a general denial of the allegations in the Petition.
The Court has carefully considered the pleadings, exhibits and evidence in this case and has made certain findings of fact.
The contractor did encounter a number of delays, one being an error in the design of the bridge which enforced suspension of work for more than 100 days. Unanticipated sub-surface conditions created a serious problem during the pile driving operation for the foundation of the bridge. Pile driving opera-ions were suspended on a critical pier designated as Bent EB-2. Anomalous sub-surface rock formations in Wheeling Creek, which were unforeseen and unanticipated by both the *198 State Road Commission and the contractor, as well as the consulting engineers, who designed the foundation for the bridge, puzzled the engineers of both parties, and caused a lengthy program of exploration, testing, core driving, analysis and ultimately a redesigning of the foundation for this pier, extending over a period of three months. Pile driving crews on the site had to be committed elsewhere and the troublesome pier site had to be de-watered and re-excavated as a result of the delay caused by the design error. The delay resulting from the error was very costly to the contractor who was required to turn his equipment on and off at the will of the State Road Commission and revise his planned sequence of operations from time to time to meet the changing conditions. Although the standard specifications of the State Road Commission, which are incorporated into and made a part of the contract, provide for suspension of work by the State Engineer (who is in control of the work) due to unsuitable weather or other conditions considered unfavorable for suitable prosecution of the work, we deem such a specification to be authority to suspend the work only temporarily for such time as may be necessary until conditions become favorable so that the work may be performed in accordance with the provisions of the contract. We cannot accept the contention of the respondent that the right to suspend the work on the project includes a right to disrupt substantially a planned sequence of operations in an area, where coordination, subcontracts, shipment of steel, storage of materials and planned relocation of utilities and maintenance of heavy traffic are critically involved, as disclosed by the evidence in this case. Future coordinated construction depended heavily on the timely construction of the foundation for the bridge. A sequence of operations planned in advance on a tight schedule of commitments with other contractors was severely disrupted. The orderly prosecution of the work was seriously handicapped by the delay required to correct the design defect and threw the contractor into confusion and construction under adverse winter weather conditions causing substantial 'damages and loss of efficiency, overtime, overhead charges and other expense. In no way was the contractor responsible for the design error and the failure of the State to take more prompt and efficient action to remedy the error aggravated the damages by preventing *199 the relocation of utilities already planned, the paving of a relocated McColloch Street, the construction of bridge abutments, the erection of structural steel, and the planned removal of a detour road which impeded construction of other bridge piers in the area.
The end result was an accordion effect on the entire project which created additional labor and material problems continuing over the winter into the following year and rendering the cost accounting standards on which the contractor made his bid proposal obsolete and meaningless. Costs were figured and allocated on the orderly procedure of the work under a planned schedule which involved not only this but two' other projects on which the contractor was working, all of these facts being known to the officials of the State Road Commission. To require management flexibility to cope with the confusion and delay caused by the State, and reintegrate his work as a prime contractor would place an unreasonable and unnecessary hardship on the contractor which is not contemplated by the contract or the specifications which authorize a temporary suspension of the work for various reasons.
It appears from the evidence that the contractor had to adopt a wait-and-see attitude on the entire project after the first sweeping and costly change in the project because of the problems arising from the design failure. Under the circumstances of this case, it would be decidedly unfair to strait-jacket the claimant to a sequence of operations formulated by the State without consideration of overhead and other costs. The responsibility for performing the contract with reasonable change orders is undoubtedly that of the contractor, but when the State becomes so deeply involved in the subject that the contractor is caused expenses of the magnitude presented in this case, it is the opinion of the Court that the State has both a legal and a moral obligation to reimburse the contractor for the losses sustained as items of damage which are the direct and proximate result of a delay or delays caused by the respondent in furnishing defective plans.
*200 A careful study of the items of damage reveals the following items of expense and damage:

The aggregate claim filed by the petitioner is in the amount of $591,597.67, which is derived by deducting the gross income received from the project from the expenses of the project revealed by its cost accounting. The Court has reduced the loss from $591,597.67 to $191,701.42 by disallowing an alleged loss of profit on the job and many other irrelevant items, as well as reducing the alleged claims for damages to amounts clearly and indisputably supported by the evidence. All doubts have been resolved in favor of the respondent where the petitioner has not sustained its burden of proof.
*201 Although the contractor has contended through counsel that it is entitled for loss of profits as a proper measure of damages, it is the opinion of the Court, after considerable research and study, that loss of profits is not a proper item of damage under the circumstances of this case. It is further the opinion of the Court that where a contract has been breached by the State by a substantial interference with the critical sequence of operations, requiring the contractor to pay his expenses on an “as built schedule” as distinguished from a “planned schedule”, the contractor should be reimbursed for the actual extra expenses and damages sustained.
We feel that the Commission had a contractual duty not to impede the orderly prosecution of the work, wilfully or negligently, and not to drastically revise work schedules during the course of construction with the end result of forcing the prime and integrating contractor into another winter of un-contemplated construction and completion of the work 110 working days beyond the planned schedule. The contention of the State that the delays suffered by the contractor were attributed to the contractor’s failure to properly plan its work schedule is untenable under the evidence of this case.
We conclude that the claimant has shown a causal connection between the breach of contract and the damages suffered and that it has sustained the burden of proof for the items herein-before mentioned. Although the petitioner contends that the difference between the reasonable costs of doing the work in the absence of delay, and the actual costs of doing the work is the proper measure of damages, we refuse to adopt the contractor’s bid estimate as a basis for measuring the reasonable cost of doing the work in the absence of delay. We believe that under the evidence in this case, the “actual cost” of doing the work under adverse conditions entailed by the unreasonable delays to be a better method of measuring damages. The contractor is entitled to compensation and not to a profit on the damages sustained. The Courts have been in disagreement on whether loss of profits is a proper item in measuring damages.
The complexity of this claim makes it impractical to discuss in this Opinion each and every item of disallowed and allowed damage with particularity. Inasmuch as this Court has held *202 that the suspension of the work was definitely due to a design error, which gave the consulting engineers of the project considerable apprehension about the safety of a bridge design for a heavy flow of traffic, the entire project was critically affected by the State’s efforts to> remedy the error and the contractor in equity and in good conscience should be reimbursed for the damages resulting from the delay. The contractor had a right to rely on the integrity of the plans furnished by the State and if those plans required correction for the safety of the travelling public, they should have been corrected with proper compensation to the contractor for its extra expense incurred because of the enforced suspension of the work.
For the foregoing reasons, an award is made to the claimant in the amount of $191,701.42, with no allowance for interest.
Claim allowed in the amount of $191,701.42.