STEPTOE, JUDGE:
The claimant contractor, Kenhill Construction Company, Inc., brought this claim which arises out of the construction of the Southern Regional Jail located in Raleigh County. Claimant contractor (hereinafter referred to as Kenhill) entered into a contract with respondent, West Virginia Regional Jail and Facility Authority, on July 28, 1992, for the construction of the Southern Regional Jail facility. Respondent gave its notice to proceed to Kenhill on that same date, July 28, 1992. The terms of the contract provided that Kenhill would have 600 days in which to build the facility. The regional jail was actually completed on July 14, 1994, 89 days beyond the planned contract completion date of March 20, 1994. The failure to complete this construction project within the 600 days provided by the terms of the contract formed the basis of this claim by Kenhill as it alleges that the 89 days required for the completion of the project were the result of unforeseen latent subsurface conditions. Kenhill alleges damages in the amount of $774,734.00. Included in this total is the amount of $177,134.00 for liquidated damages assessed by respondent and interest *47 upon the liquidated damages of $38,255.00.
Kenhill alleges that the unforeseen latent subsurface conditions caused it to incur indirect costs including costs related to inefficiencies in its construction of the project, costs for its acceleration efforts in an attempt to complete the project in a timely manner, additional expenses for backfill material, dewatering, equipment, management personnel, travel expenses, employee benefits, and costs for fuel and lubricants for equipment, utilities, escalation of Workers’ Compensation Premiums for labor, and home office overhead and loss of profit. Kenhill also urges that the liquidated damages wrongfully assessed by respondent and the interest thereon be made a part of the damages awarded to it.
Respondent contends that Kenhill failed to provide timely notice in accordance with the terms of the contract as to its intention to make a claim for indirect costs related to the delay in the completion of the project. For this reason, respondent contends that the claim fails in its entirety and should be denied by the Court. Furthermore, respondent contends that actions on the part of Kenhill and its subcontractors were the cause for the delay in completing this project as well as certain weather factors, and it was not the unforeseen latent subsurface conditions that caused any delay.
It is necessary for the Court to begin its discussion of the this claim by describing the construction of the Southern Regional Jail as adduced from witnesses during the nine days of hearing this claim which took place February 1997 and May 1997. The Court then will address each of the issues raised by the parties in the context of the evidence, and lastly, the Court will address the issue of damages.
FINDINGS OF FACT CONSTRUCTION OF THE SOUTHERN REGIONAL JAIL
As stated hereinabove, Kenhill entered into a contract (known as a Purchase Order) with respondent for the construction of the Southern Regional Jail with notice to proceed being given Kenhill on July 28, 1992. Kenhill’s contract provided that it would be the general construction trades contractor meaning that it would have the responsibility for coordinating the activities of all of the prime contractors on the project.[1] The architect for this project, having been contracted for the job by respondent, was ZMM/CRA (hereinafter referred to as ZMM) and it commenced the project by holding a pre-construction conference on August 18,1992. The schedule provided at that meeting by Kenhill indicated that it intended to pour slabs on grade between October 14, 1992, and December 16, 1992. Pouring the slabs on grade was determined to be the first construction step necessary by Kenhill as the project as constituted, consisted of several pods for a block building requiring thousands of concrete masonry units. Excavation to a depth of 15 feet below subgrade or to rock was to begin that week when Kenhill immediately encountered a large amount of subsurface water. The plans prepared by ZMM for this project indicated that a large French drain was beneath the surface of the ground on which the regional jail was to be constructed, said drain having been placed there previously during the construction of 1-64 which abuts upon this project on the project’s southerly side. Although Kenhill attempted to locate this French drain, it was to *48 no avail. On September 18, 1992, respondent determined that Kenhill would have to install a large French drain with a connecting finger drain and a small curtain drain. This work was defined in a change order entered into by the parties and designated as GT-01.[2] Kenhill proceeded to excavate below the planned excavation grade to place the French drain. The French drain extended from the area southeast of E pod (the in-take area) through the area of D pod to the northwest corner of A pod (the out-flow area). The trench was approximately seven to eight feet in depth and six feet in width with a rubber membrane placed in the bottom and on the sides, large rocks layered on the bottom, then a layer of gravel, and finally covered with a layer of filter fabric. This structure allowed for drainage from the interstate through the construction site to a marsh located adjacent to the site on the west side. The French drain and the curtain drains were deemed by the parties to be necessary to protect the engineered fill from subsurface water and, in turn, to protect the integrity of the slabs on grade which would form the pad for the jail facility. Kenhill and respondent agreed upon the terms of payment for the direct costs of this extra work and Kenhill was paid accordingly. These directs costs are not in issue in this claim.
However, the construction of this French drain altered the sequence planned for the construction of the various pods for the jail facility. These pods were designated as A pod, B pod, C pod, D pod, and E pod. A pod, B pod, and C pod were the areas of the jail for housing prisoners while D pod and E pod were visitor and administration areas. A pod was a maximum security area and had different security requirements than B pod and C pod. Originally, Kenhill planned to construct the pods beginning with E pod, then C, D, B, and A pods, but it started excavating at E and D pods in it efforts to find the French drain, then went to B and C pods when it was determined that either the French drain was not there or that Kenhill just could not find it.[3] In any event, the unplanned construction of the French drain by Kenhill began on or about September 18, 1992, the final decision having been made by respondent and its architect as to the remedial measures to be taken for the extensive water problems at the site. The French drain ran east to west through the project with a curtain drain around the south end of B pod. This work was completed on November 13, 1992.
During the months of September through December, Kenhill was excavating at various areas and placing the engineered fill in lifts as required by the terms of the contract. Footers for the building were also being laid. On January 12, 1993, Kenhill was directed by respondent to halt all work in the area of B pod while a decision was made as to the course of action to be taken at this site due to continuing subsurface water problems. Kenhill installed a second curtain drain around the south end of B pod when it became apparent to respondent that the subsurface water problems were continuing to hamper construction in this area. This work was later confirmed and paid for by GT-02. The second curtain drain alleviated the water problem, but another problem was encountered which concerned respondent. The integrity of the engineered fill at B pod was believed to have been affected by subsurface water problems. At a meeting of the parties in Charleston on April 21,1993, a decision was made to attempt a pressure grouting procedure to stabilize the soil beneath B pod. This course of action was thought to be a way to avoid removing all of the *49 engineered fill which had already been placed. Respondent, through its architect and engineer[4], directed that EB Consultants, Inc., should be used for the work, but after several weeks of unsuccessful efforts to engage this company as the subcontractor, Kenhill entered into a subcontract with Intrusion Pre-Pakt. This took several additional weeks. Thus the work on B pod was not completed until June 23, 1993. The original change order for this work, GT-03, was for a guaranteed maximum price of $85,000.00, but Kenhill was paid its actual costs which were approximately $51,000.00. These direct costs are not in dispute.
The weather during the 1992-93 winter months was another obstacle to Kenhill in its progression of the project. There was wet weather in February and a severe snow storm in March 1993 resulted in a shut-down of the project for two weeks. Kenhill continued to pour footers for the pods as weather permitted, but no slabs on grade were poured at the site until April 18, 1993. The last slab on grade was poured on July 20, 1993, at the site for A pod, approximately seven months after the originally planned date of December 16, 1992, for the completion of the slabs on grade.
During the construction season of 1993, Kenhill’s masonry subcontractor manned the project such that the block structures for C pod, D pod, E pod, and B pod were under roof by the fall. However, A pod was not roofed until late 1993 and was not “dried in” until the spring of 1994. The area of A pod had been used for storage of material during excavation activities so the engineered fill was placed there last and it did not dry for some months due to having been subjected to winter weather during the 1992-93 season. The fact that A pod was not “dried in” until the spring 1994 became a critical issue to Kenhill for the completion of the project.
During the 1994 spring, Kenhill had a subcontractor engaged in painting the pods and it was engaged itself in performing the final work on the project. During this same period of time there was work being completed by the other prime contractors. There were punch list items to be accomplished and this process took several months. The majority of the punch list work was the responsibility of Kenhill’s painting subcontractor, NLP Enterprises (hereinafter referred to as NLP). The completion date provided in the contract was March 20, 1994, but Kenhill did not receive a certificate for substantial completion from ZMM until June 17, 1994.
Thus, the Southern Regional Jail was ready for occupancy. Kenhill continued to assert its claim as first stated in its December 20, 1993, letter based upon events which had occurred during construction. Respondent assessed liquidated damages against Kenhill for the 89 day delay in the completion of the project and an additional amount of retainage for warranty issues.
The Court, having stated the basic relevant facts adduced during the hearing of this claim, now proceeds to the consideration of the various issues presented to it during the hearing. These issues will be considered individually.
ISSUE OF NOTICE
The respondent herein has put forth with some particularity its position that Kenhill failed to give it notice in a timely manner of its intentions to make a claim for indirect costs resulting from the delay in the completion of the Southern Regional Jail as required by the terms of the contract. Respondent relies upon language in its contract with Kenhill as well as language on the change orders, particularly GT-01, GT-02, GT-03 and GT-04. The General Conditions to the contract provide as follows:
§4.3.8.1 If the Contractor wishes to make Claim for an increase in the
*50 Contract Time, written notice shall be given. The Contractor’s Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.
(Emphasis supplied.)
§4.3.3 Time Limits on Claims. Claims by either party must be made within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be made by written notice. An additional Claim made after the initial Claim has been implemented by Change order will not be considered unless submitted in a timely manner. (Emphasis supplied.)
It is uncontroverted that the claim by Kenhill for indirect costs based upon delay was put forth with particularity in correspondence from Kenhill dated December 20, 1993. Kenhill takes the position that the notice was timely because this was the time at which it became fully cognizant that it could not complete the contract by March 20, 1994, due to its inability to complete A pod. Respondent is of the opinion that the language on the face of the change orders provides the contractor with the opportunity to give notice of its claim for additional time needed to complete the project as it contains the following statement:
“The Contract Time will be (increased) (decreased) (unchanged) by ( ) days.”
This space was left blank by Kenhill as was the next line on the GT-01 change order which states:
“The date of Substantial Completion as of the date of this Change Order therefore is”
GT-01 was executed by Kenhill on January 25, 1993, although the work was completed in November 1992. This was the work for the French drain and certain finger drains necessitated by the unforeseen latent subsurface conditions. Kenhill contends that at that point during construction of the project it did not have reason to believe that additional time would be needed to complete its work; therefore, it could not have completed these blanks with any degree of certainty. Likewise, the change orders for the additional curtain drain at B pod (GT-02) and the pressure grouting work (GT-03) had the same spaces blank. These were executed by Kenhill on May 19, 1993, and June 1, 1993, respectively. On September 29, 1993, GT-04 was executed by Kenhill with language that
“The date of Substantial Completion as of the date of this Change Order therefore is March 20, 1994.”
On GT-05 executed on November 11, 1993, the line for days had “(0) days.” and the date of substantial completion as March 20,1994. GT-06 executed on February 11, 1994, (executed by the parties after Kenhill had made its claim known to respondent by letter dated December 20,1993) had a blank for days and the substantial completion date of March 20, 1994. The Court makes specific reference to the language of the change orders as respondent relies heavily on this language in its theory of a lack of notice by Kenhill of its claim for delay. However, respondent was certainly aware of the unforeseen latent subsurface condition as it worked with Kenhill to *51 determine any remedial work necessitated by the water on the project, and it directed the remedial work made necessary by these water problems. There were specific references to time impact in letters dated April 22, 1993, and May 11, 1993, that accompanied both GT-01 and GT-02, respectively, wherein Kenhill stated
“Any schedule or time impact is not included and has yet to be determined. ”
Kenhill’s testimony as well as that proffered by the respondent established that at the time the French drain, curtain drains, and pressure grouting work was on-going, Kenhill believed that it would be able to complete the project on or before March 20, 1994. It intended to make up any delay in pouring the slabs on grade, originally scheduled for completion in December 1992, by executing the block work portion of the work in an accelerated and expedited manner; in fact, this was almost accomplished by Kenhill. It is also obvious that the language in the change orders could not have been so crucial to the parties as GT-07 did not have any language change as to the contract time (marked [0] days and completion date of March 20, 1994) when both parties were well aware of Kenhill’s claim for additional time to complete this project by that date.
CONCLUSIONS OF LAW AS TO THE ISSUE OF NOTICE
The Court is aware that the issue of notice is one of the most important issues in this claim and it will be addressed prior to the consideration of any other facet of the claim. Respondent’s position that the whole claim fails due to the lack of timely notice by Kenhill rests with its interpretation of certain claims decided by this Court previously. In the claims of Holloway v. Div. of Highways, Unpublished opinion (1991), Westbrook Construction, Inc. v. Div. of Highways, (Unpublished opinion), and Tri-State Asphalt, Inc. v. Div. of Highways, (Unpublished opinion), the Court considered claims for damages due to extra work not contemplated by the terms of the contract and held that written notice to the owner must be provided in order that the owner and the contractor both have an opportunity to accurately document the work being performed by the contractor so there could be a comparison of the costs incurred. The work performed by Kenhill per the change orders for the French drain and the curtain drains constituted the extra work on this project; however, both parties kept records for the labor and equipment so that the cost of the extra work was documented and paid for by the change orders.
The damages claimed by Kenhill in the instant claim are indirect in nature as these flow from the extra work resulting from the discovery by the parties that there were unforeseen latent subsurface conditions. Work done in the winter which was contemplated by the contractor to be done in more seasonable weather, for instance, may result in inefficiencies on the project. Thus, a claim based upon a changed condition such as unforeseen latent subsurface conditions constitutes a breach of contract by the owner and the same principle of notice does not apply. C.J. Langenfelder, Inc. v. Dept. of Highways, 8 Ct.Cl. 193 (1971). Notice is not the crucial issue in a claim of unforeseen latent subsurface conditions as it is in extra work claims. The work being performed is contemplated by the contract and both parties can be expected to maintain all the necessary records to document the direct costs being charged against the contract. However, there may be accelerated activity by the contractor, inefficiencies in performing its work, or a change in the sequence of the work causing additional costs in performing the same work. These are indirect costs not contemplated by the parties. The delay in the progress of the work is not known by either party until the work progresses to a point that the completion of the contract is not possible within the contract time. There certainly was notice to respondent of the changed physical condition on this project as respondent had to determine the remedy to correct the changed physical *52 condition not contemplated by the parties. Once the delay appears to be a reality then, and only then, the terms of the contract requiring notice to the owner become a matter of importance. The Court has determined that the state of mind of the parties during the 1992-93 winter was that the project would be completed timely; therefore, the issue of notice does not bar Kenhill’s claim based upon delay as put forth in its letter of December 20, 1993.
DELAYS ON THE PROJECT
As part of the delay issue, the Court first must address the matter of the schedules provided to respondent throughout the construction of this facility. Emphasis was placed upon the so-called Strickland schedule (a computer generated program known as Primavera) of January 22, 1993, such that the Court must comment upon this aspect of the claim. The schedule was prepared by John Strickland, Project Manager on this project and a Vice President of Kenhill. This was the only schedule to show an early completion date of December 1993. The schedule was based upon a January 7, 1993, data date at which time the major problems with the shut down of B pod had not yet occurred. Also, John Strickland left the project before this event occurred. All of the other schedules showed a completion date of March 20, 1994, per the contract time. The personnel most closely in contact with the project, being Michael Leach for Kenhill and Henry Breeden for respondent, agreed that the monthly “look ahead” schedules actually used on the project provided all of the contractors on the job with the true picture of what could be anticipated to be accomplished monthly. This may not meet the specific terms of the contract, but with the problems resulting from the water issue, this scheduling method was considered appropriate at the time to meet the needs of the contractors. The bar charts put forth by Kenhill did provide a more accurate schedule for “as planned” activities. Respondent’s expert used the Strickland schedule to form his basis of the “remaining days analysis” theoretically to prove that Kenhill should have completed the project by March 20, 1994, per the 600 days in the contract. Since the Court does not give much weight to the Strickland schedule, the expert’s analysis does not provide the Court with substantial and conclusive evidence that Kenhill should have completed the project on time and is, therefore, solely responsible for the 89 days of delay in the completion of the project.
The issue of the completion of the slabs on grade forms Kenhill’s basis for the delay of the completion of this project. Kenhill desired to pour all of the slabs on grade by mid-December 1992 in order to have a platform on which to proceed with the masonry work. The regional jail is a block project by nature so the sooner block can be laid, the sooner the project can progress to completion. The slabs on grade were scheduled for the front 20 per cent of the project time, but actually took 60 per cent of the total contract time. As soon as Kenhill came on the project, its schedule was disrupted by the unforeseen latent subsurface condition, i.e., the water problems. Kenhill could not proceed until the water problem was addressed by respondent’s design engineer and architect. Of course, Kenhill was able to man the project to perform some tasks which had to be done, but excavation activities were limited until the decision to excavate the large French drain and the curtain drains was made by respondent and the drains were in place. Then Kenhill had problems with where to put wet material excavated. Its sequence for the areas to be completed with the engineered fill was disrupted. Its attempt to recover the lost project time for the unforeseen latent subsurface condition was evident in the way the masonry work progressed during the summer of 1993. In fact, Kenhill was able to recover a substantial amount of the lost time. Its inability to complete A pod and have it “dried in” by the winter of 1993 affected the completion of the project. The Court is of the opinion that the late completion of A pod was a direct result of the water problems experienced early in the project when the slabs on grade could not be poured *53 per the original plan. This finding by the Court leads to the conclusion that the delay in the completion of the project was caused by the unforeseen latent subsurface conditions. Therefore, the Court attributes the delay to circumstances beyond the control of Kenhill.
MASONRY SUBCONTRACTOR ISSUE
The masonry subcontractor for Kenhill was Bat Masonry. Personnel from this company came onto the project on November 23,1992, which was nine days after masonry work could have actually begun. In accordance with the terms of the contract, Bat Masonry was required to submit a cold weather plan to respondent for approval as well as other submittals. Respondent contends that part of the 89 day delay is attributable to the failure of Bat Masonry to start its work timely and to submit its cold weather plan and other submittals when it came onto the project. At this early stage of construction in November 1992, the footers were being placed and Bat Masonry’s employees were stockpiling block at various locations in preparation to begin its work. It later had to shut down its workforce on the project due to the shut down of B pod in January 1993. The evidence establishes that Bat Masonry had employees on-site and working prior to the approval of its cold weather plan and other submittals. The Court does not believe that any time was lost on the project due to failure to act on the part of Bat Masonry. In fact, documentation submitted to the Court substantiates Kenhill’s assertion that its masonry subcontractor manned this project in an exemplary manner in an attempt to bring the project to completion in March 1994. The Court has determined that Bat Masonry did not cause any delay as contended by respondent.
DELAY BASED UPON WEATHER
There were delays on this project occasioned by events other than the delay in pouring the slabs on grade. Weather was a factor on the progression of this project during the winter of 1992-93. The testimony and evidence established that Kenhill was forced to shut down the job for a severe winter snowstorm during March 1-18, 1993. In its December 20, 1993, letter to respondent putting forth its claim, Kenhill lists delay occasioned by weather at 36 days due to abnormal amounts of precipitation during February and March 1993. The testimony for both parties acknowledges that weather certainly did affect the progress of work during this time frame. However, the schedule for performance of the contract prepared by Kenhill included a certain number of days for “float” for the completion of various critical path items. For a contractor to ignore the severe winters known to be the norm for the Beckley area is then the contractor’s error in judgment and not the fault of the respondent. The General Conditions in the contract state as follows:
§4.3.8.2 If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time and could not have been reasonably anticipated, and that weather conditions had an adverse effect on the scheduled construction.
The Court does not believe that 36 days of the delay alleged for weather is fair and reasonable and, further, it is unsubstantiated by the record. The Court has determined that a portion of the delay in the completion of the project is attributable to weather factors.
PUNCH LIST DELAYS
There was testimony during the hearing concerning the punch list process and the events *54 that occurred during the period from March 1994 through the completion of the project in June 1994. Kenhiil takes the position that the process took far longer than necessary by reason of events related to other prime contractors. Respondent on the other hand contends that the delay in the punch list process was the fault of NLP, the painting subcontractor to Kenhiil, and that Kenhiil is not entitled to any delay for this period of time. The alleged paint problems were based upon the fact that respondent was demanding a certain level of perfection which was not met by NLP, such that eventually there was a determination made as to which level of anticipated paint finish would be required in the various pods. This appeared to resolve the problems and NLP completed its work. The evidence in this claim supports the contention of the respondent that NLP was not performing its subcontract as anticipated and that even Kenhiil appeared to be frustrated by the progress and performance of its subcontractor. The Court is of the opinion that NLP did not perform as normally anticipated by an owner such as respondent, and failed to complete the painting of the jail in a timely and workmanlike manner.
Other on-going problems during the punch list process are attributable to other aspects of the project. There were problems with the day room tables placed in each of the pods providing living quarters for inmates. These specially ordered tables were being furnished by Peterson Enterprises, a subcontractor of the prime contractor Norment Industries, W.S.A. Inc., which had its own contract with respondent. The first problem was with the gussets attaching the tables to the floor and the second problem was with the inadequacy of the seats at the tables. The table gussets were to be secured to the floor in each pod, but there was a problem with the gussets being too loose. After the correction of this problem, the floors had to be finished by NLP. NLP also had to paint the tables as well as the seats. There was a problem with the welds for the seats and the correction entailed the installation of a second seat cover being fitted over the original seat. Peterson finally completed the corrections to the seats on June 22, 1994. These were problems solely in the control of the respondent.
There was also a problem with Security Fence Company in its installation of the fence and gates at the jail. Kenhiil could not finish its final seeding and mulching of the grounds surrounding the facility until such time as the fencing was in place. The fence contractor was under the control of respondent, and the fence was not in place until May 20, 1994.
On April 25, 1994, the Fire Marshal inspected the project for a Certificate of Occupancy which was not granted because there were items listed to be accomplished before such Certificate could be given. The items listed were minor on the part of Kenhiil, but other items listed were under the control of the respondent. The Court considers all of these items to be accomplished during the punch list process to be de minimis in time as other major issues were on-going at the time. The Court concludes that was no delay in the completion of the project based upon the fact that the Fire Marshal’s Certificate of Occupancy was not granted for the project until June 20, 1994.
Similarly, the Court does not give any merit to respondent’s contention that Kenhill’s steel erector, Summit Erectors, was off the job for two to three weeks in 1994. There was no general work stoppage for this period of time and Kenhiil continued with the masonry work on the pods during this time frame. Respondent could have shut down the project had this been such an important event.
ISSUE OF DELAYS - FINDING OF FACT BY THE COURT
The Court finds that the number of days delay attributable to the owner and the number of days attributable to adverse weather as determined by the Court, grossly exceeds the number *55 of days by which Kenhill failed to meet the original contract completion date notwithstanding any delays attributable to the performance of NLP.
DAMAGES
Kenhill put forth a theory on inefficiencies which is one of first impression for the Court. Kenhill asserts that its inefficiencies can be quantified by using a percentage method developed by the U.S. Army in a study of airport runway construction and repairs. The inefficiencies allegedly occurred when Kenhill had to perform construction work in winter weather, specifically during the period from December 1992 through April 1993, which would have been performed during the fall months of 1992 but for the unforeseen subsurface conditions encountered at the beginning of the project. The formula presents a method for a daily calculation of the windchill factor based upon temperature and wind. Then a composite effective rate for the period is calculated. The percent calculated for the winter of 1992-93 by Kenhill was 28.3%. This percentage was multiplied by labor costs with a resulting loss calculated at $24,433.00; for equipment the loss was calculated to be $11,193.00. Kenhill used four months in its calculation of inefficiencies for equipment, but only three months for labor. This seems inconsistent to the Court; therefore, only the months of December 1992 through March 1993 will be considered under any theory of inefficiency due to weather. As to the U.S. Army theory, it seems logical to the Court that a contractor will incur inefficiencies for both its equipment and labor during winter months. However, to attempt to calculate an exact percentage may stretch that logic somewhat. The Court is of the opinion that Kenhill was not performing sufficient work during the months of January through March 1993 to assess any coefficient for alleged inefficiencies. The record establishes that the weather prevented any appreciable amount of work from being performed. Since it is not an item that may be ascertained with any degree of accuracy, the Court has determined that it will not grant any award based upon inefficiencies alleged by Kenhill. Thus the labor costs in the amount of $24,430.00 and the equipment costs in the amount of $11,193.00 are denied as these costs were calculated solely as the costs of inefficiencies on the project.
ADDITIONAL EXPENSES
In prior claims based upon a changed condition, this Court has determined awards on the theory of quantum meruit. Most of the damages which issue from a changed condition are indirect costs to the contractor. The reason for this is that work performed pursuant to a change order is paid based upon quantified costs agreed to by the parties. Indirect costs include those costs based upon acceleration costs incurred in an attempt to make up time lost due to delays on the project and additional costs incurred during the extended time on the project. The Court analyzed the damages put forth by Kenhill from the position of each party.
Additional expenses alleged to have been incurred by Kenhill during the winter months include the items of backfill in the amount of $22,113.00, unsuitable backfill material expenses in the amount of $4,312.00, and dewatering expenses in the amount of $9,116.00.
The unsuitable backfill material item represents the excavation of wet material that had been placed by Kenhill as engineered fill, but was rendered unsuitable due to the wet winter conditions to which it was subjected when slabs on grade were not poured when anticipated. The backfill material put in its place was gravel purchased by Kenhill. The contract provided for payment of the engineered fill. Kenhill asserts this work was done to accelerate the project. These items are considered by the Court to be costs directly related to expenses resulting from the delay on the project and the Court will include $26,425.00 in its award.
*56 As to the dewatering item, Kenhill claims this amount for extra dewatering of the footers due to the winter months and the excess water on the project. There was an item in the contract for dewatering as this was anticipated due to weather conditions, but Kenhill asserts that the item exceeded expectations due to the particular conditions on this job. The Court has determined that Kenhill experienced excessive water on this project which cannot be attributed just to the weather. Therefore, the Court will consider this item in the amount of $9,116.00 as part of the damages.
In addition to the items mentioned specifically above, Kenhill submitted an extensive list of its damages for the period of March 20, 1994, through project completion on July 14, 1994. Certain of these items have been considered by the Court to be actual costs incurred by Kenhill during the March through June 1994 time frame. Other items are considered by the Court to be speculative in nature or in previous contract claims which have been denied by the Court. Therefore, the Court will not consider the home office overhead item, even though Kenhill used the Eichleay Formula to calculate this amount. The Court considers this element of damages to be speculative in nature and it has consistently refused to speculate as to home office overhead in contract claims. The Court also denies wage escalation costs, Workers’ Compensation escalation costs, and the vehicle expense item for the superintendent. The contract provides for profit at 15 % which has been calculated by the Court upon its award for those items stated hereinabove.
LIQUIDATED DAMAGES
At the close of this project, respondent assessed liquidated damages against Kenhill alleging that the 89 days delay in the completion of this project was attributable to actions on its part during construction. Liquidated damages in the amount of $89,000.00 calculated at $1,000.00 per day in accordance with the terms of the contract were withheld from Kenhill at the completion of the project. An additional amount of $88,134.00 was withheld for retainage for alleged warranty problems existing on the project at this time which were not addressed in any detail by respondent. Kenhill asserts that it is entitled to recover $177,134.00, plus interest. The Court, having addressed the issue of the delay in the completion of the project, is of the opinion that Kenhill is entitled to recover the assessed liquidated damages. The completion of the regional jail beyond the date of March 20, 1994, was the result of many factors some of which involved the other prime contractors. Therefore, the Court will grant Kenhill the amount of $177,134.00 plus interest as provided by the terms in the contract.
In accordance with the findings of fact and conclusions of law as stated hereinabove, the Court grants an award as an equitable adjustment to Kenhill for the unforeseen latent subsurface conditions encountered in its construction of the Southern Regional Jail and for liquidated damages, in the total amount of $380,862.25. Additionally, interest upon this award has been calculated in accordance with §13.6.1 of the contract at the legal rate from the 17th day of August, 1994, through and including the date on which this opinion is issued.
Award of $489,519.39.

 This is fairly typical on construction projects built by respondent as this affords local bidders an opportunity to seek and be successful in obtaining contracts for projects in West Virginia. However, other and perhaps all of the prime contractors may be subject to delay problems If one of the prime contractors fails to complete its work in a timely manner.

 Although the normal designation would be CO-01, Kenhill as the general contractor had all of its change orders designated by letters GT meaning general trades contractor.

 Whether the drain noted on the plans by the architect exists has never been determined.

Respondent’s engineering firm for this project was Triad Engineering, Inc.