Sayre, Judge:
Claimant, American Vending Company Inc., (herein after referred to as American Vending) brought this action for breach of contract on the part of the respondent, West Virginia University (herein after referred to as WVU). American Vending began operating the concessions at WVU athletic events in 1974, and continued this service until June 30, 2001. The contract at issue is the 1996 contract referred to by the parties as WVUEA 96-03. American Vending alleges it is due the amount of $591,404.67 plus interest in the amount of $295,702.34[1] (as of December 2004)for the value of equipment furnished to WVU during its contracts with WVU and depreciation in accordance with the terms of the contract. The various issues of the claim are addressed by the Court herein below with the finding of fact and conclusions of law addressed separately for each issue.
The successive contracts for American Vending to provide concessions at the various athletic venues for WVU began in 1974. (At this time, WVU was still using the old “Mountaineer Field” located in the downtown area of Morgantown. However, the new stadium was built during 1978-79 and American Vending thus was the original *2 concessionaire at the new stadium.) During the period of serving as concessionaire for WVU, American Vending was requested by WVU to make various improvements having little or nothing to do with vending concessions (which American Vending did for a fraction of the “prevailing wage”) such as the buried television cables and circuits which it installed. This issue is considered by the Court later in this opinion. Other major improvements were also made by American Vending, such as the Scoreboard Café, all of which enhanced sales of concession items which, of course, was a benefit to both parties financially.[2] American Vending asserts that when the contract terminated, it incurred expenses and lost equipment that was its separate property. All of American Vending’s contentions are addressed by the Court individually in this opinion. The contract which is the subject matter of this claim was not cancelled for cause by WVU but rather the contract term expired. American Vending through its complaint seeks $591,404.67 plus interest and attorney’s fees. (This Court has a past practice that it does not award attorney’s fees, so this part of the claim will not be addressed separately or be discussed further.) As indicated herein above, American Vending now seeks $740,369.64 in damages for breach of the 1996 contract at the conclusion of the term of that contract (June 30, 2001) plus $510,062.86 in interest to June 30, 2006, plus simple ten percent (10%) from June 30, 2006, of the payment of an award, if any, in this claim.
WVU asserts that American Vending is not entitled to any compensation based upon WVU’s interpretation of the contract.[3] WVU contends that there was never an agreement made by the parties as to how depreciation would be handled, and that Generally Accepted Accounting Principles should apply. WVU argues that the 1996 contract was, in effect, merely a lease and, therefore, based upon Generally Accepted Accounting Principles, depreciation should be so calculated as not to extend beyond the length of that contract, which by its terms expired on June 30, 2001.
The Court notes that WVU’s Answer to this claim did not include a cross claim, counter claim or off-set. Therefore, the Court concludes that the sole issue before the Court is what is the sum due American Vending by reason of the award by WVU of the 2001 concessions contract to a third party vendor. Starting in 1974, all of the successive contracts, including the 1996 contract, were prepared by WVU. Thus, any issues regarding the language in the 1996FY contract must, by contract law, be construed against WVU where there is ambiguity.
*3 CONTRACT NEGOTIATIONS AND TERMS OF THE CONTRACT
The first issue to be discussed herein by the Court involves the evidence surrounding the contract negotiations which eventually failed between the parties and which gave rise to this claim filed by American Vending. These negotiations were lengthy, but an historical perspective is necessary to understand the process of the negotiations.
American Vending had been the concessionaire for WVU at the former Mountaineer Field located on the main campus beginning in 1974, and the company continued these services when WVU constructed the new Mountaineer Football Stadium in 1978-79 time frame with the first football season beginning in the fall of 1980. The contracts for these services were entered into for successive five year terms, but it was not at all unusual for the a renewal contract to be approved some months after the new contract term had begun. Thus, American Vending was not concerned that the contract for the 2001F Y was not being negotiated prior to July 1, 2001. The normal routine was that the contract negotiations took place during the first year of a five year term, with the contract being approved in the fall of that year. During the contract period ending June 30,2001, to the knowledge of American Vending, there had not been any problems with this relationship. At least this was the opinion of the officers of American Vending. Basically, the contract that had been in place since 1996 seemed to American Vending to be satisfactory to both parties.
The Court must first consider whether American Vending had reason to believe that it was going to receive a contract to continue to provide concession services to WVU for five years and whether the terms of the contract for 2001FY would, in fact, provide for the payment of depreciation extending beyond June 30, 2001, upon fixtures placed by American Vending during the terms of the previous contracts under which it had provided concession services at the various sports venues maintained by WVU.
The testimony and evidence in this claim supports a finding by this Court that American Vending had reasonable cause to believe that a renewal contract with American Vending would be forthcoming. It was not unusual for American Vending to receive the executed contract in the fall of the fiscal year during which it was already providing concession services at the various athletic venues, especially at the football stadium. Therefore, American Vending had no reason to question the period of time during which it opined that negotiations were on-going. The Court is of the opinion that the actions and language of personnel from WVU certainly support the belief on the part of American Vending that a contract was being negotiated and that the contract would include some appropriate reference to a depreciation schedule. At no time prior thereto did anyone in a position of authority at the WVU Athletic Department inform American Vending that the contract with American Vending was in jeopardy. Thus, it is no surprise to the Court that American Vending claims surprise when it did not receive the new contract in a timely manner.
For years prior to the execution of the 1996 concessions contract between WVU and American Vending (“the 1996 Contract”), there had existed a custom, usage, and practice of WVU allowing American Vending profit, overhead, and interest on construction and similar substantial improvements the company performed in its role as concessionaire. American Vending contends that there is a custom of institutions granting vendors a vested interest in improvements. In fact, at all times pertinent the time of the contract which is the subject matter of this claim, Craig Walker was the Assistant Athletic Director for Finance and Administration. As such, he had the authority to bind WVU in its negotiations with American Vending while he was at WVU. There developed a *4 custom and usage of verbal agreements between American Vending and WVU which were acceptable to both parties.
American Vending had “placed the ball in WVU’s court” so to speak, and it was patiently waiting for an executed contract. While it was awaiting the contract, it prepared its employees for operating the concessions at football games at the stadium as it had done in the many years prior to the 2001 season. When it received word that it would not be the concessionaire contractor for the 2001 fiscal year, it was necessary to begin the process of removing its separate equipment and calculating the costs it incurred in performing the set-up operations for the coming football season.
The reasons, if any, for the decision made to award the concessionaire contract to another contractor are not important for the purpose of this decision. The Court is of the opinion that WVU did not inform American Vending in a timely manner that it would not be awarded the new contract as it had anticipated. The Court further finds that American Vending is entitled to all its reasonable costs expended in preparation for serving as the concessionaire for the 2001 football season. These costs will be discussed more fully by the Court herein below.
However, the crux of this claim became apparent to WVU during negotiations of the contract for the 2001 fiscal year when American Vending pressed the issue of the depreciation to be agreed upon by the parties for all of the permanent fixtures that American Vending had installed during previous contracts. This issue, it seems to the Court, became the “10,000 pound gorilla” for WVU. American Vending was insisting that specifics be addressed in the contract to resolve this issue. What depreciation should American Vending receive based upon the what number of years needed to be decided upon by the parties prior to the terms of the contract being negotiated. It appears that those in authority at WVU were unable to grasp this issue and make any decision. Thus, the specific issue that must be determined by the Court is: Is American Vending entitled to any depreciation, and if it is entitled to depreciation, how many years should be used to calculate that amount?
ISSUE OF DEPRECIATION
The parties herein each presented testimony from experts on the issue of depreciation, why depreciation is important to American Vending, what is the basis for the depreciation, which of the fixtures, if any, should be subject to a depreciation schedule, how many years should be used to calculate depreciation payments, and is American Vending even entitled to any depreciation on the fixtures.
There is an abundance of testimony on both sides as to the extensive negotiations which were on-going concerning the issue of depreciation. Both parties look to the contract in place during the 2000FY, which was the last year of the 1996 contract with American Vending as the concessionaire for WVU. The exact paragraphs from that contract provide as follows:
2.1 American Vending Company will purchase additional equipment as outlined in their response dated April 16,1996. All equipment shall remain the property of American Vending Company until fully depreciated as agreed upon by the University. It then becomes the property of the University.
2.2 Improvements and additions to the Facilities. American Vending Company will provide improvements and additions to the facilities as outlined in their response dated April 16,1996. *5 Any improvements to facilities as approved by the University shall be the financial responsibility of American Vending Company and may be depreciated as agreed upon by the University. Improvements to the facilities, structure, plumbing, electrical service, etc. shall become the property of the University upon completion or installation at the end of the contract period. Any proposed changes to the physical structure must be submitted to the University for consideration and approval, and agreed to in writing b the University before American Vending Company can proceed.
2.3 - Depreciation Payment - If American Vending Company makes an investment and the contract ends before the agreed upon depreciation schedule is completed, the University will pay the contractor the un-depreciated amount. If the contract is terminated for cause, the equipment and other investment become the property of the University without payment of the un-depreciated value. (Emphasis supplied.)
It is central to the findings in this case to note that upon the execution of the 1996FY contract American Vending attempted to finalize the agreement between it and WVU on the calculation of depreciation on the several items here at issue. In fact, American Vending in 1997 prepared and presented to John D. Twining, Assistant Athletic Director for Finance and Administration, and as such, the WVU official with whom American Vending was to negotiate. In the course of discovery in this claim, American Vending found that Twining, in his own hand, on a copy of American Vending’s 1997 proposed agreement with the subject line “Vested Interest Agreement” wrote the following: “O.K w/concept met w/Martin 7/14/97 dep - 20/25yrs permanent fixture”.
American Vending’s proposal was never responded to in writing by WVU. However, in Twining’s deposition (taken in 2006), Twining testified that as a result of American Vending’s concerns that there be an agreement about depreciation before certain major improvements were, at WVU’s request, undertaken by American Vending during the years 1996-2001, he met with American Vending on July 14, 1997. At that time, he assured American Vending that he was okay with the concept of 20 to 25 years depreciation for permanent improvements.
WVU argues that Twining, as Assistant Athletic Director for Finance and Administration, had no actual authority to bind WVU. The Court, however, finds that even if he in fact, exceeded his authority, he was negotiating on behalf of WVU with American Vending and, at the least, had apparent authority to do so.
Be that as it may, in reliance upon Twining’s assurances, American Vending borrowed considerable amounts of money (at interest) and undertook the various major improvements at the stadium that were accepted by WVU and are still in place. This, in the opinion of the Court, constitutes, at a minimum, a unilateral contract. It follows that WVU, by accepting the benefit of American V ending’s permanent improvements, under basic principles of contract law, is obligated to pay a fair price for the same.
The fact that the parties were facing in 2001 a serious dilemma is evident in the language of an email between Russ Sharp and Ed Ames - two of the employees negotiating terms of the new contract with American Vending. The email is as follows:
Ed- Please review. I need to involve legal to determine how we can negotiate our way out of this depreciation deal in the current contract. Also, we need to develop a stategy (sic) to negotiate with Martin on the possible removal of the Scoreboard Café area if we construct the North Suite Project. Note: that I have also included some language about future beer/malt beverage sales. Let me know what you think and how we might want *6 to proceed on the legal questions. Russ Sharp
The subject of depreciation was on the minds of all the principal parties during this time frame of negotiating the contract. It is the opinion of the Court that this major stumbling block caused extensive delay on the part of WVU in negotiating with American Vending in good faith on the terms of the contract. Eventually, as noted hereinbefore, the contract and the issue of depreciation became moot, at least to WVU’s satisfaction, when WVU awarded the contract to another concessionaire. However, that did not end the issue for American Vending since it pursued a resolution of this issue of depreciation for some time frame and, failing that, it made the determination to file this claim.
The experts for the parties testified from exact opposite positions. Gary K. Bennett, a Certified Public Account, testified on behalf of American Vending and provided a depreciation schedule for consideration by the Court. He calculated the Boole Value for various items as being a total of $660,922.90. He also calculated interest at ten (10) per cent (to December 1,2006) for a total of $357,998.47. These two numbers combine for a total amount of $1,018,921.37. He based his calculations upon the useful life of each permanent fixture and the months varied from a low of 120 months for instance for the boiler to a high of 348 months for the closed circuit television installation. The Court recognizes that generally accounting principles were used in the area of depreciable assets and there was reference to the specific Accounting Research Bulletin 43, Accounting Principles Board Opinions -6 and 12, as well as the Financial Accounting Standards Board - 109 and 143, and the Financial Accounting Standards Board Interpretation - 47. His method of calculating the depreciation for American Vending appears to the Court to be well founded.
Claimant’s expert, Gary K. Bennett, calculated depreciation of American Vending’s major improvements under the 1996 Contract, using time periods consistent with such agreement and the projected useful lives of the improvements, and in some cases, using more conservative depreciation schedules which were substantially shorter than the proj ected useful life. Bennett could identify no authority which would require American Vending to depreciate its major improvements over a period shorter than those identified, particularly a period as brief as the five-year term of the 1996 Contract. Bennett performed two calculations of total claimed damages and interest based upon depreciation schedules for improvements not greater than 20 years, the lesser of the 20/25 years detailed in Mr. Twining’s notes.
Bennett calculated American Vending’s losses based upon an analyses allowing interest from the date of improvements, consistent with practice and custom in past dealings with WVU through Craig Walker, and supplemental American Vending documents. This analysis also reflects the fact that American Vending essentially acted as WVU’s lender and general contractor for the costs and construction of such improvements at a much lower cost than the “prevailing wage.” This analysis resulted in an undepreciated value for the improvements of $740,369.64, and interest through December 1, 2006, of $510,062.86, for a total claim under this methodology of $ 1,250,432.50
Bennett also calculated the undepreciated value of such improvements, without allowing interest from the date that improvements were placed into service as $660,922.90. He also calculated interest on that sum from the end of the contract, July 1, 2001, which is the date at which WVU’s obligation to compensate American Vending for the undepreciated value of the improvements. This obligation clearly arose as of December *7 1, 2006, in the amount $373,073.83, for a total alternative claim of $1,061,826.35.
WVU contends that there is no provision within the 1996 Contract which specifically provides for the payment of interest. Paragraph 13 of the 1996 Contract states: “Payments may only be made after the delivery date of goods or services. Interest may be paid on late payments in accordance with the West Virginia Code.” WVU argues that this is in reference to the Prompt Payment Act which is not applicable in this claim. As there is no contractual provision for interest to be paid on any undepreciated value of the improvements, WVU contends that this Court cannot award any interest in this claim.
Daniel Selby testified on behalf of WVU as to his method of calculating depreciation and his opinion as to whether American Vending was entitled to any depreciation. His professional opinion is that no depreciation is due and owing by WVU because American Vending should have recouped all its investment during the years of its previous contracts. He opined that the contract herein is actually a lease and that all improvements made by American Vending require five years or less term of depreciation. This assertion appears to be based upon the fact that American Vending was allowed a reduced percentage on its sales in compensation for its expenditures for improvements. However, Selby was at a distinct disadvantage in rendering his expert opinion since it appears from his testimony that he was not aware of the negotiations on-going by the parties to address this very issue.
In the opinion of the Court, there is no factual basis for Selby’s position that American Vending was obligated to depreciate the subject claim items as leasehold improvements, limited to the term of the 1996 contract, as opposed to the projected useful lives of the respective improvements, after which the equipment would belong to WVU. Moreover, the Court is of the opinion that the concession agreement is not a leasehold agreement, and there are no GAAP standards which preempt controlling contract language (written by WVU). It also appears that Russ Sharp, Assistant Athletic Director for WVU, contrary to Selby’s opinion, concluded that WVU was obligated to compensate American Vending for the undepreciated value of the major improvements it performed under the 1996 contract which he calculated to be $182,938.18.
The executed 1996 Contract included Sections 2.2 and 2.3, which governed the implementation of improvements to WVU facilities and WVU’s attendant obligations to reimburse American Vending for the undepreciated value of improvements at the conclusion of the 1996 contract, unless the 1996 contract was terminated for cause. The 1996 contract was not terminated for cause, but instead expired on its own terms. Section 2.3 specifically provided that if American V ending “makes an investment and the contract ends before the agreed upon depreciation schedule is completed, the University will pay the contractor the un-depreciated amount.”
No later than November 28, 2000, a draft renewal concessions contract between American Vending and WVU was circulated among WVU staff members. Mr. Shaffer requested two extensions of the negotiations, to July 30,2000, and August 21,2000, both of which were granted by Ed Ames, Chief Procurement Officer for WVU. As of no later than August 17, 2000, Mr. Shaffer believed that the negotiations with WVU had been timely and successfully completed and were simply being reduced to writing by WVU.
By letter dated February 14, 2001, Ed Ames of WVU informed Martin Shaffer that the 1996 Contract would not be renewed, asserting WVU’s position that an extension of the 1996 Contract had not been achieved prior to the August 21, 2000, deadline for negotiations. Prior to this letter, WVU had not informed Mr. Shaffer, or any other agent or employee of American Vending, of its position that contract negotiations were *8 incomplete. Between the beginning of these negotiations and the February 2001 letter from Mr. Ames, American Vending incurred expenses in the amount of $114,609.36 to comply with demands made by WVU to effect renewal of the 1996 Contract.
Based on submittals by American Vending, John Twining’s acquiescence in proposals to depreciate the maj or improvements at issue, the Court is of the opinion that there was an oral agreement between American Vending and WVU to depreciate such improvements over a minimum of twenty (20) years and a maximum of twenty-five (25) years.
The Court has reviewed the exhibit prepared by Gary Bennett, hereinbefore discussed through his testimony and adopts his schedule of depreciation for the purpose of calculating depreciation for each separate item to the extent that he used twenty (20) years as the term for calculating depreciation. The Court concludes that the on-going negotiations for an agreement between the parties for depreciation did not contemplate any schedule of depreciation of a longer term than twenty (20) years and any depreciation is limited to no more than that number of years. Therefore, the Court will use the Bennett depreciation schedule for its determination of amounts awarded for depreciation per item limited as described herein above and addressed per item below.
EQUIPMENT INSTALLED BY AMERICAN VENDING
During the term of its contracts with WVU at the new stadium, American Vending had a desire to increase sales and, thus, revenues for both American Vending and WVU. American Vending first proposed building specialty stands for the sale of a number of non-menu/non-contract items (referred to as “the Nacho Stands”), as well as installing exhaust hoods and fire suppression systems, so that french fries could be processed and sold at the stadium during the 1991 contract. In American Vending’s 1991 proposals, there were provisions for a mechanism through which American Vending would be able to recoup its future investment. Thus, American Vending and WVU agreed that American Vending would pay a reduced commission (the amount of 15% rather than the usual 44.44%) to WVU on the specialty items and french fries.
In 1994, Martin Shaffer, Treasurer of American Vending, met with Craig Walker, then Assistant Athletic Director for Finance and Administration at WVU, to agree upon American Vending’s retention of a vested interest in the Nacho Stands, fire suppression systems and french fry exhaust hoods which it installed at WVU’s athletic facilities. American Vending purchased and installed the exhaust hoods and fire suppression systems using the company’s own resources. There was agreement by the parties for reduced commissions as a payment method for American Vending’s work on improvements to WVU facilities. WVU was to reimburse American Vending for any undepreciated value of such improvements not recovered through a commission adjustment from 44.44% to 15%. This commission reduction was achieved to enable American Vending to pay off the improvements over a period of time far beyond the term of the 1991 Contract.
The Court finds that for the installation and use of the Nacho equipment, there may be no recovery for depreciation on this equipment because the removal of the equipment was accomplished prior to the expiration of the 1996 contract. Therefore, the Court will not make any award to Ameripan Vending for this item of alleged damages.
SCOREBOARD CAFÉ
In late summer 1996, American Vending proposed construction of an addition to the football stadium which was later known as the “Scoreboard Café.” This was proposed *9 for the 1997 season and began in tent form. American Vending constructed an earthen berm and asphalt pad for the Scoreboard Café, consistent with its $20,000.00 line item set forth in American Vending’s response to the 1996 RFP. After the 1997 football season, WVU required that American Vending replace the Scoreboard Café with a much more substantial structure. In effect, American Vending constructed an elaborate and substantial structure at WVU’s request for its entertaining purposes, not to increase concession sales or revenues. WVU’s physical plant and environmental health and safety division approved all work on the new Scoreboard Café. The Scoreboard Café was placed into service in September 1998, at a cost of $145,488.80, (plus $27,580.67 paid to Taylor Rentals for the Café tent), which far exceeded the projection of $20,000.00 set forth in the company’s response to the RFP. This construction effort on the part of American Vending caused it to remove the original asphalt pad and berm, and it was required to solicit engineering, architectural, and construction work in the rebuilding effort, which included a parapet wall and concrete cap with conduit containing electrical lines installed underneath. The Scoreboard Café was operated by American Vending until WVU needed the area for suites, which it built at that end of the stadium.
American Vending contends that on August 23,1996, Martin Shaffer submitted to John Twining, Assistant Athletic Director at WVU, a memorandum reciting a proposed depreciation schedule of twenty (20) years for the Scoreboard Café, which was, at that time, intended to consist of only an asphalt pad with surrounding landscaping and a tent to shelter a buffet line. In addition, Mr. Shaffer included in this memorandum a calculation of “10% Administrative Cost” [overhead] and 10% profit, added to the total projected cost of the improvement. At no subsequent time did Mr. Twining or any other agent or employee of WVU reject or express exception to Mr. Shaffer’s proposed depreciation schedule for the Scoreboard Café, or the inclusion of charges for overhead and profit, similar to a cost plus proposal. American Vending’s attempts to reduce the agreement to writing were unsuccessful chiefly because of the time pressures imposed by the start of the 1996 football season, which necessitated rapid work to complete the berm and asphalt pad for use at the first game that season.
However, on August 29, 1996, the 1996 Contract was accepted without reservation by WVU, and it was approved by the West Virginia Attorney General’s office on September 25, 1996.
Following the July 14, 1997, meeting between Martin Shaffer and John Twining, American V ending made substantial investments of equipment and labor in WVU athletic facilities, in reliance upon the agreement and understanding reached with Twining that American Vending would be reimbursed for the undepreciated value of its major improvements upon expiration of the 1996 Contract. American Vending obtained a loan in order to have sufficient funds to construct the new Scoreboard Café. Also, in reliance upon WVU’s obligations under Sections 2.2 and 2.3 of the 1996 Contract, American Vending obtained this loan, whereby American Vending’s officers had to put up real estate and personal stocks as collateral. When American Vending could not repay the subject loans because of WVU’s refusal to reimburse the company for undepreciated value, the lender collected against such real estate and personal stocks.
WVU contends that the parties never agreed to a depreciation schedule for the Scoreboard Café, or for any other equipment or improvement. As stated previously in this opinion, all equipment and improvements will be considered for a depreciation schedule. Therefore, the Court will make an award for depreciation as indicated and makes an award in the amount of $124,877.89 for the depreciation on this item. *10 However, the Court is not inclined to make any award for the calculation of depreciation for the Scoreboard Café Taylor rentals since this equipment was not permanent in nature for use by WVU or American Vending.
CLOSED CIRCUIT TELEVISION SYSTEM
During 1997 and 1998, Mr. Shaffer, having attended a football game at the University of Notre Dame in South Bend, Indiana, and observing a closed circuit television system at their concession stands, determined that the installation of a closed-circuit television system throughout its concessions facilities in Milan Puskar Stadium would increase sales since fans could continue to watch the football game while making food and beverage purchases. Of course, additional sales also meant more commissions for WVU, so such an improvement could benefit both parties. American Vending then proceeded to install the necessary conduit and mounting hardware for the system. American Vending incurred total expenditures of $133,563.13 ($115,333.40 for installation and $18,229.73 for the televisions) in installing the closed-circuit TV system, which was placed into service in September 1998, remains in use by WVU’s current concessionaire and was available for use by the fans as recently as the 2006 home football games.
WVU asserts that the closed circuit television system now belongs to it.[4] According to Section 2.2 of the 1996 Contract, “[ijmprovements to the facilities, structure, plumbing, electrical service, etc. shall become the property of the University upon completion or installation at the end of the contract period.” Further, WVU reasserts its position that the 1996 Contract should be treated as a leasehold for purposes of depreciation, which means that the equipment and improvements should be depreciated over the life of the contract, and that therefore the closed circuit television system and the conduit and hardware systems installed for the closed circuit television system should have been completely depreciated with the expiration of the contract.
The Court finds that American Vending may make a recovery of $13,064.64 for the closed circuit televisions and $102,262.44 for the installation of the closed circuit televisions which was reduced based upon a twenty (20) year life since these are improvements to the facilities at the WVU stadium which are probably still being used by the subsequent concessionaire.
BOILER INSTALLATION
In the summer of 1999, American Vending began installation of a boiler in Commissary 11 of Milan Puskar Stadium, in order to provide a reliable source of hot water for the company’s sale of hot chocolate and coffee during games. American Vending was required to install a gas meter and gas main leading into the stadium to bring the boiler *11 system online. The boiler was placed into service in October 2000, at a total cost of $71,660.14 ($40,645.35 for the boiler and $31,014.79 for installation), and remained in use by WVU’s current concessionaire during 2006 home football games.
WVU reasserts its position that the 1996 Contract should be treated as a leasehold for purposes of depreciation, which means that the equipment and improvements should be depreciated over the life of the contract, including the boiler, and that therefore WVU owes nothing to claimant for the undepreciated value of the boiler installed by American Vending. However, the Court disagrees with this position as explained previously in this opinion and finds that depreciation is due and owing to American Vending for a useful life limited to twenty (20) years. The Court makes a total award for the equipment and installation in the amount of $67,681.32.
WORK PERFORMED AT THE WVU COLISEUM
During the fall and winter of 1999, and into the spring of 2000, WVU was involved in a proj ect to remove asbestos-containing materials from its Coliseum. During this proj ect, which extended into the 1999-2000 basketball season, American Vending was unable to conduct concessions operations at the Coliseum, yet the company still fulfilled its commission guarantee to WVU. Following the asbestos removal, WVU requested that American Vending refurbish some of its concessions areas that were impacted by the project. In addition to compensating third parties for this painting work, during the fall of 2000, American Vending performed several other improvements to WVU facilities, as requested by WVU in the course of renegotiation of the 1996 contract. American Vending incurred expenses totaling $9,791.67 for its work performed at the Coliseum. Concurrent with American Vending’s efforts in this regard were repeated communications from employees at WVU stating that a formal renewal of the 1996 contract was imminent, and that the document was being drafted by WVU’s Office of General Counsel. The Court is of the opinion that WVU received the benefit of work performed for it and, further, that WVU should reimburse American Vending for this expense. Thus, as to the renovations performed by American Vending at the Coliseum, the Court finds that American Vending may recover $6,364.59 for this item since this was required by WVU in order for concessions to be provided during the basketball season and the area normally used for this purpose was not available to American Vending due to work at the coliseum during this time frame. Thus, the Court includes the amount of $6,364.59 as part of its award to American Vending .
MISCELLANEOUS EXPENSES
In addition to the repainting of Coliseum concessions areas, American Vending incurred substantial expenses in the late fall and summer of 2000, in reliance upon its understanding that its concessions contract would be renewed. Such expenses totaled $114,609.36, and arose from the purchase of uniforms, various concessions supplies, and other items necessary to comply with negotiations with WVU concerning renewal of the 1996 Contract. American Vending was unable to utilize these uniforms and supplies for other purposes, as they were specifically designed in accordance with WVU’s requirements. In contrast to the request for proposals (“RFP”) for the 1996 contract, the RFP for the 2001 contract did not obligate American Vending’s successor as concessionaire to purchase this remaining inventory.
WVU contends that items such as uniforms, various concessions supplies, and other items fall under Section 2.4 e. II of the 1996 Contract which states “Equipment and Improvements - American Vending Company has proposed the following equipment and improvements for Mountaineer Field and the Coliseum to be funded and paid solely by *12 American Vending Company at no expense to the University.” These items were to be supplied by American Vending at no expense to the University; therefore, American Vending is owed nothing for these items.
The Court would agree with this position of WVU were it not for the facts and circumstances surrounding the new contract. American Vending incurred these expenses in anticipation of being the vendor for the fall football season and WVU did not award the contract as anticipated. Therefore, the Court finds that WVU should reimburse American Vending for these expenses which it reasonably incurred in the amount of $114,609.36.
In the fall of 2000, American Vending installed a gas line in Stand 12 at Milan Puslcar stadium, incurring expenses totaling $ 1,437.63 for which it alleges that it has not received any depreciation. The work was performed by its labor force who were paid based upon non-union scale wages. The Court has determined that American Vending may make a recovery for the useful life of this item based upon twenty (20) years which calculates as being the amount of $ 1,357.26.
ADDITIONAL EQUIPMENT PURCHASES
During the years 1997-2001, American Vending purchased and placed into service various items of equipment necessary to maintain or improve its concessions operations under the 1996 Contract. American Vending’s expenditures for items of equipment placed into service on or before January 1 of each year of the 1996 Contract are as follows: 1997,$11,959.83; 1998, $29,216.34; 1999, $14,532.75;2000, $14,142.98;2001, $4,863.53. The Court concludes that American Vending may make a recovery for the book value of this equipment in the total amount of $60,311.79.
In addition, certain items of equipment returned to American Vending by WVU at the expiration of the 1996 Contract had been damaged by no fault of American Vending. The value of the equipment damaged and rendered useless was $16,639.00 while the value of equipment not returned by WVU has an estimated book value of $96,362.97.
WVU contends that there was no evidence presented to substantiate American Vending’s claims for lost or damaged equipment. American Vending had from February 2001 to June 30,2001, to remove any equipment that they contended was their property. Further, American Vending was notified by letter dated July 16, 2001, that WVU would begin changing locks on July 19, 2001, and that if American Vending needed access to the facility to remove any equipment and supplies, its employees were responsible for contacting the Athletic Department. Further, Mr. Shaffer testified that the equipment was to be placed in tractor trailers by WVU, and that this equipment was later received by American Vending. WVU argues that to the extent equipment was allegedly lost or damaged, it is due to American Vending’s own negligence or delay in not removing the equipment. The Court agrees with this position of WVU.
As to the equipment which was not returned by WVU to American Vending, the Court is of the opinion that American Vending had a substantial investment in the equipment for which American Vending should receive some compensation. Also, this equipment may still be in use by WVU or its vendor so it has value to WVU. The Court has determined that American Vending may make a recovery of forty (40) per cent of the book value of this equipment which is $38,545.19.
CONCLUSIONS OF LAW
The Respondent, West Virginia University, had a duty of good faith and fair dealing with *13 respect to the Claimant, American Vending Company, which necessitated compensating Claimant for the substantial undepreciated value of the improvements it made under its concessions contract with WVU. The November 2000 email communication between employees of WVU which cited a “need to involve legal to determine how we can negotiate our way out of the depreciation deal in the current contract,” as well as the October 22, 2001, letter from Bobbie Brandt regarding settlement in exchange for a release of all claims, both demonstrate an unequivocal departure from this obligation.
Because Respondent cannot identify any instance in which any of its agents or employees expressed to any agent or employee of claimant that WVU objected to Claimant’s proposed depreciation schedule of twenty (20) to twenty-five (25) years for major improvements, respondent is estopped from asserting there was no meeting of the minds between the parties concerning depreciation. Based on the course of dealings between the parties, respondent’s silence in this regard constituted its acceptance of depreciation over useful lives exceeding the term of the contract.
In its performance of substantial improvements under the 1996 contract, American Vending relied upon the expectation of proper payment from WVU for the undepreciated value of the these improvements.
Each major improvement for which claimant seeks compensation was either performed out of necessity to fulfill claimant’s obligations under the 1996 Contract, or performed at the request of WVU. Further, WVU benefitted substantially from such improvements, many of which are still in place and may be available for use by the current concessionaire.
PROFIT, OVERHEAD AND INTEREST
Based on custom, usage, and practice between the parties prior to the 1996 Contract, American Vending contends that it is entitled to adjustments for profit and overhead, as well as interest calculated from June 30, 2001 (the date of termination of the 1996 Contract). Furthermore, particularly with respect to the Scoreboard Café, Boiler, and Closed Circuit TV System, respondent utilized claimant’s services as if the company were a general contractor. Thus, because profit and overhead are routinely charged to State agencies by outside contractors, equity demands that profit and overhead be awarded.
In contrast to the Court’s prior decision in Hourly Computer Services v. Dept. of Health and Human Res., CC-00-191, Claimant did not submit to Respondent a “legitimate uncontested invoice” as contemplated by the Prompt Pay Act, W. Va. Code § 5A-3-54. The amounts claimed due by American Vending under the 1996 Contract have been disputed by WVU since shortly after July 1, 2001-when such contract expired and American Vending had a right to collect such amounts under Sections 2.2 and 2.3 of that contract. Further, because claimant had not submitted a “legitimate uncontested invoice,” claimant had no recourse to the courts of the state to obtain a writ of mandamus to compel the State Auditor to tender payment. This Court is of the opinion that its refusal to award “finance charges” in Computer Services also precludes it from awarding interest charges to American Vending which it incurred in financing the major improvements presently before this Court for consideration.
This Court is of the opinion that the provisions of the 1996 contract between the parties does not provide for the payment of interest for a legal dispute such as the action pending herein. The terms in the contract referring to interest on late payments for invoices which have not been paid in a timely manner is not the issue before this Court. In the decision *14 of the Court being rendered herein, there has been a determination by the Court on the merits of a claim for depreciation and other allegations of amounts due for acts on the part of the respondent, but not the issue of late payment on invoices. Therefore, the Court denies any interest upon the award it is making to American Vending in this claim.
As to profit and overhead, an award for such damages cannot be made unless expressly stated in the terms of the contract. Since the contract did not provide for these damages, the Court must deny recovery. In addition, the Court has previously denied damages for overhead expenses and loss of profits based on the premise that they are speculative in nature. See Kenhill Construction Co., Inc. v. West Virginia Regional Jail and Facility Authority, 22 Ct. Cl. 46, 56 (1998) (denying damages for home office overhead due to the fact that these damages were speculative in nature); Walker v. Dept. of Highways, 18 Ct. Cl. 11, 13 (1989) (holding that the Court will not resort to speculation in order to compensate a claimant for loss of profits). Thus, the Court denies any recovery by American Vending for profit and overhead.
In accordance with the finds of fact and conclusions of law as stated herein above, the Court is of the opinion to and does make an award to American Vending in the total amount of $529,087.48.
Award of $529,087.48.
The Honorable Judge Franklin L. Gritt Jr., former Presiding Judge of the Court, took part in the decision of this claim during his term. However, he did not take part in the written decision. Based upon that fact the decision of the Court was rendered on June 30,2007, the opinion has been issued as of that date even though it was not completed in written form until January 11, 2008.
The Honorable George F. Fordham, Presiding Judge of the Court, did not take part in the hearing or decision ofthis claim since he requested to be recused and an Order of Recusal was entered.

The final amounts claimed ($740,369.64 plus interest of $510,062.86 or in the alternative the amount of $688,752.53 plus interest of $373,073.83) were provided to the Court in the Claimant’s brief filed March 30, 2007, and were substantially more than the amounts in the original claim.

 One wonders if the improvements made by American Vending have been a benefit to its successor as vendor for concessions at the athletic venues, at no cost to that contractor? Also, one wonders if the new vendor remitted a higher percentage of sales to WVU, based, at least in part, upon the availability of these improvements for use by the successor vendor without cost to that vendor?

 Although this is the position of WVU in the claim before the Court, the Court notes that prior to the filing of the claim there was correspondence dated October 22, 2001, to American Vending from WVU’s General Counsel’s Office wherein WVU’s calculations of the amount owed American Vending by WVU is put forth in itemized detail. This correspondence was not couched as an offer or compromise. The total of the calculations made in that correspondence states the amount due and owing by WVU to American Vending for depreciation as being $182,936.18.

 The Court notes that American Vending installed this wiring system at the direction of WVU surrounding the entire stadium. The work was performed by American Vending’s employees at less than the prevailing wage rates which would have been required to be paid by WVU if it had performed with a local contractor. See Aramark Facility Services, Inc., v. Concord University, 26 Ct.Cl._, 2007, wherein this Court made an award to Aramark when the WV Dept, of Labor required it to pay summer employees for painting done at the request of Concord. Students were used for the summer work and were paid minimum wage rates. This Court made an award for the additional monies that Aramark was required to pay the students.